# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

TONIA VERRET; JACOB VERRET; BENJAMIN
VERRET; A.V., by and through her parent and next
friend Tonia Verret; M.V., by and through her parent
and next friend Tonia Verret; W.V., by and through
his parent and next friend Tonia Verret; and J.V., by
and through his parent and next friend Tonia Verret,

     Plaintiffs,

vs.                             Case No.

THE CITY OF HOBBS; HOBBS POLICE DEPARTMENT;
CHIEF CHRIS MCCALL, in his official and individual capacity;
SHAWN HARDISON, in his individual capacity;
BRIAN GENEROTZKY, in his individual capacity;
SHANE BLEVINS, in his individual capacity;
NATHAN EUBANK, in his individual capacity;
MARK MUNRO, in his individual capacity;
ALBERT KEENAN, in his individual capacity;
DOUGLAS EVANS in his individual capacity;
ANDREW HERNDON, in his individual capacity;
JOSHUA JAMES in his individual capacity;
and JOHN DOES, in their individual capacities.

     Defendants.                  **Jury Trial Requested**

## COMPLAINT FOR DAMAGES
## CAUSED BY DEPRIVATION OF CIVIL RIGHTS
## AND OTHER TORTIOUS CONDUCT

     COME NOW Plaintiffs Tonia Verret, Jacob Verret, Benjamin Verret, A.V., M.V., W.V.,

and J.V. (collectively, the "Verret family"), by and through their counsel, Rothstein Donatelli LLP,

and bring this Complaint for Damages Caused by Deprivation of Civil Rights and Other Tortious

Conduct against Defendants.

## PARTIES

1.      Plaintiff Tonia Verret is now and at all times material hereto has been a resident of Lea County, New Mexico.

2.      Plaintiff Jacob Verret is a resident of Travis County, Texas. At all times material hereto, he was a resident of Lea County, New Mexico.

3.      Plaintiff Benjamin Verret is now and at all times material hereto has been a resident of Lea County, New Mexico.

4.      Plaintiff A.V. is a minor, and a resident of Lea County, New Mexico.

5.      Plaintiff M.V. is a minor, and a resident of Lea County, New Mexico.

6.      Plaintiff W.V. is a minor, and a resident of Lea County, New Mexico.

7.      Plaintiff J.V. is a minor, and a resident of Lea County, New Mexico.

8.      Plaintiffs A.V., M.V., W.V., and J.V. bring this complaint through their mother, Tonia Verret.

9.      Defendant City of Hobbs ("Hobbs") is an incorporated municipality, a body politic, and a municipal corporation under the laws of the State of New Mexico, and Defendant Hobbs Police Department is an agency thereof. It is also a governmental entity and local public body as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, §§41-4-3(B) and (C). As such, Hobbs may be sued in its name and has the authority to delegate to the Hobbs Police Department and its Chief of Police, Chris McCall, final policy and decision-making authority regarding law enforcement matters. Defendant Hobbs is also a political subdivision of the State of New Mexico and a "person" under 42 U.S.C. §1983. At all times material hereto, Hobbs was the

employer of Defendants McCall, Hardison, Generotzky, Blevins, Eubank, Munro, Keenan, Evans, Herndon, James, and of the John Does.

10.     Defendant Chief Chris McCall was at all times material hereto a resident of Lea County, New Mexico. At the time of the matters complained of herein, Chief McCall was a full-time, salaried law enforcement officer, was employed by Hobbs as its Chief of Police, and was a public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(D), (F)(2). At all times material hereto, Chief McCall was acting under color of law and within the scope of his duties as Chief of Police of Hobbs. At all times material hereto, Chief McCall was the supervisor of Defendants Hardison, Generotzky, Blevins, Eubank, Munro, Keenan, Evans, Herndon, James, and the John Does.  At all times material hereto, Chief McCall was responsible for hiring, training and supervising subordinate law enforcement officers of the Hobbs Police Department and was the final decision maker and policy maker for Hobbs with regard to law enforcement matters. In connection with Plaintiffs' claims under 42 U.S.C. § 1983, Chief McCall is sued in his official capacity and in his individual capacity.

11.     At the time of the matters complained of herein, Defendant Detectives Generotzky, Blevins, Eubank, Munro, and Keenan were full-time salaried law enforcement officers and public employees as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 44-4-3(D), (F)(2), and, at all times material hereto, were acting under the color of law and within the scope of their duties as law enforcement officers with the Hobbs Police Department. In connection with Plaintiffs' claims under 42 U.S.C. § 1983, Defendants Generotzky, Blevins, Eubank, Munro, and Keenan are sued in their individual capacities.

12.     At the time of the matters complained of herein, Defendant Officer Hardison, Evans, Herndon, and James were full-time salaried law enforcement officers and public employees

as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 44-4-3(D), (F)(2), and, at all times material hereto, were acting under the color of law and within the scope of their duties as law enforcement officers with the Hobbs Police Department. In connection with Plaintiffs' claims under 42 U.S.C. § 1983, Officers Hardison, Evans, Herndon, and James are sued in their individual capacity.

13.     Upon information and belief, John Doe Defendants are or were at all times material hereto officers employed by the Hobbs Police Department. After investigation and inquiry, Plaintiffs are presently unaware of the identities or exact number of John Doe Officer defendants, and therefore sue these defendants by fictitious names. Plaintiffs will amend this complaint once the true identities of these Defendant John Doe Officers are uncovered during formal discovery. At all times material hereto, John Doe Officers were law enforcement officers and public employees as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, §§41-4-3(D) and (F). At all times material hereto, John Doe Officers were acting under color of law and within the scope of their duties as officers with the Hobbs Police Department. In connection with Plaintiffs' 42 U.S.C. § 1983 claims, John Doe Officers are sued in their individual capacities only.

14.     Defendants Generotzky, Blevins, Eubank, Munro, Keenan, Hardison, Evans, Herndon, James, and John Does, upon information and belief, were, at all times material hereto, residents of Lea County, New Mexico.

15.     For purposes of Plaintiffs' state and common law tort claims, Defendant Hobbs is liable for the acts and omissions of its employees, agents, and contractors under the theory of vicarious liability, *respondeat superior*, or aided-in-agency.

## JURISDICTION AND VENUE

16.     All of the material acts or omissions to act complained of herein occurred in Lea County, New Mexico.

17.     This Court is a court of general jurisdiction, and as such, has concurrent jurisdiction over the state and federal claims set forth herein. *See Haywood v. Drown*, 556 U.S. 729, 731 (2009); N.M. Cons. art. VI, § 3.

18.     In connection with Plaintiffs' state law claims, the acts and omissions complained of herein that constitute the basis of liability against the Defendants come within the scope of the waiver of immunity contained within the New Mexico Tort Claims Act, NMSA 1978, § 41-4-12.

19.     In connection with Plaintiffs' state law claims, the Defendants received timely written notice pursuant to the New Mexico Tort Claims Act, NMSA 1978, § 41-4-16(A).

20.     In connection with Plaintiffs' state law claims, the Defendants received timely actual notice pursuant to the New Mexico Tort Claims Act, NMSA 1978, § 41-4-16(B).

21.     This Court has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

22.     This Court has supplemental jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

23.     Venue is properly laid in the District of New Mexico pursuant to 28 U.S.C. § 1391(b).

## FACTS COMMON TO ALL CAUSES OF ACTION

24.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully stated herein.

25.     On September 6, 2015, Tonia Verret arrived at a gas station in Hobbs, New Mexico, barefoot and with her son Ben.

26.     Upon arrival, Mrs. Verret requested that the cashier call 911, which the cashier did, just moments after midnight on the morning of September 7, 2015.

27.     Mrs. Verret reported that her husband, William Verret, had hit her in the face and that he had swung a "goose gun" at her and her son Ben.

28.     Mr. Verret hit Ben in the arm with the "goose gun."

29.     Mrs. Verret and Ben walked the few blocks to the nearby gas station.

30.     The dispatcher contacted Hobbs Police Department, sending officers to the gas station to speak with Mrs. Verret.

31.     Mrs. Verret explained what had happened with Mr. Verret, including that when she and Ben had fled, she had left the other five Verret children, ages 1 through 19, at their home, in their respective bedrooms.

32.      Hobbs police officers went to the Verret home for a welfare check.

33.     Upon arrival, the officers attempted to make contact with Mr. Verret.

34.     After waiting outside, in front of the house, for some time, Defendant Hardison and Officer Mattocks knocked on the door.

35.     Jacob Verret, 19, came to and answered the door.

36.     At that moment, Defendant Evans made contact with Mr. Verret in the back yard, yelling over the radio that he had done so, and the other officers ran to the back yard, with Defendant Hardison running through the house.

37.     Mr. Verret was holding an unloaded shot gun and yelling at the officers.

38.     The officers shouted at Mr. Verret to drop the gun, but he did not do so.

39.     After a minute and a half, Officers Troy Brackeen and Alvin Mattocks, along with Defendant Evans, shot Mr. Verret.

40.     Jacob Verret watched the entire encounter through the back window of the house.

41.     Jacob could hear the officers shouting, and though he could not make out what his father was saying, he could tell that he was shouting back.

42.     Jacob watched the officers repeatedly shooting his father, firing numerous rounds.

43.     After the officers shot Mr. Verret, Defendant Hardison ordered that the house be cleared, whereupon officers entered the house, going into the individual bedrooms and taking custody of the minor Verret children.

44.     An officer, believed to be Defendant Evans, placed Jacob Verret in handcuffs and told him "you're just being detained for now."

45.     The NMSP Investigative Report indicates that Defendant Evans also placed some of the minor Verret children in a police car.

46.     Upon information and belief, Defendant Hardison ordered that Plaintiffs Jacob, A.V., M.V., W.V., and J.V.  be taken to the Hobbs Police Station family room.

47.     The NMSP Investigative Report indicates that Defendant Herndon transported some of the Verret children to the Hobbs Police Station.

48.     Upon information and belief, another officer(s), either one or more of the named Defendant(s) or one or more of the John Doe Defendant(s), transported the remaining Verret children to the Hobbs Police Station.

49.     Before the shooting, Defendant Generotsky was called to the gas station to talk to Mrs. Verret and Ben Verret.

50.     Both said they did not wish to be transported to the hospital.

51.     While Defendant Generotsky was speaking to Mrs. Verret and Ben Verret, the shots that killed Mr. Verret were fired.

52.     Ben Verret heard the shots and the shouting over the radio that there had been a shooting and told his mother that "they shot dad."

53.     Defendant Generotsky instructed Defendant James to transport Mrs. Verret and Ben Verret to the Hobbs Police Station.

54.     Defendant James took Mrs. Verret and Ben Verret to the Hobbs Police Station in a police car around 1:00 a.m. or 1:30 a.m. on September 7, 2015.

55.     Mrs. Verret and Ben Verret were placed in separate interview rooms by Defendants.

56.     Plaintiffs Jacob Verret, A.V., M.V., W.V., and J.V. were placed in a family room at the station around 1:00 a.m. or 1:30 a.m.

57.     None of the Verret family was told anything about the shooting, or why they were being held.

58.     Mrs. Verret made a phone call to her stepfather, Clayton Floyd, around 2:00 a.m. on September 7, 2015.

59.     Mr. Floyd arrived at the Hobbs police station around 2:15 a.m. on September 7, 2015.

60.     Mr. Floyd told the woman at the front desk he was there to pick up the Verret family.

61.     The woman at the front desk told Mr. Floyd that she would let someone know.  Mr. Floyd was not permitted to go into the station beyond the lobby reception area, and he was not allowed to communicate with or retrieve the Verret family.

62.     Mr. Floyd waited and waited, and the woman at the front desk eventually told him someone would be down in a minute.

63.     Finally, a detective, either a named Defendant or a John Doe Defendant, came down and spoke with Mr. Floyd, saying he needed to talk to another detective.

64.     At that point, nobody would tell Mr. Floyd what had happened.

65.     The first detective went back and got another detective, another named Defendant or John Doe Defendant, who eventually told Mr. Floyd what had happened around approximately 3:30 a.m.

66.     Mr. Floyd asked to take the Verret family home with him, as he had been waiting to do for some time.  The two detectives told Mr. Floyd that he could not take the Verret family home, and that they were waiting for the New Mexico State Police.

67.     Mr. Floyd was not told that Mr. Verret had been killed until hours later, around 5:30 a.m.

68.     John Doe defendants (including, perhaps, various of the named defendants) held the Verret family. It is unknown at this point which Hobbs officers exactly were involved in holding the Verret family. Defendants Blevins, Keenan, Eubank, Munro, and Generotzky were all detectives listed on the CAD logs as being on duty between the hours of 12:00 a.m. and 3:00 a.m. on September 7, 2015. It is possible the John Does responsible for holding the Verret family and who spoke to Mr. Floyd are listed by name as Defendants. Plaintiffs will amend this complaint once they discover the identities of these Defendant John Doe Officers.

69.     Additional John Doe Defendant(s) whose name(s) is unknown at this time was monitoring the doors to the respective interview rooms holding Mrs. Verret and Ben Verret.

70.     Mrs. Verret was held alone in an interview room at the Hobbs police station.

71.   Mrs. Verret was not told anything about her husband's shooting, despite her questions about what had happened.

72.   Mrs. Verret was not permitted to leave the Hobbs police station, despite asking if she could leave several times.

73.   Despite asking questions, Mrs. Verret was not told anything about what was going on.

74.   Every time Mrs. Verret got up and headed toward the door, defendant John Doe (as described above) was right there.

75.   Mrs. Verret was permitted to smoke several cigarettes outside, but was accompanied by this same officer remaining in custody the entire time, ultimately escorted back to the interview room.

76.   Ben Verret was also held alone in an interview room at the Hobbs police station.

77.   Mrs. Verret could hear Ben coughing and crying in the nearby interview room.

78.   Mrs. Verret was not told where Jacob or the other children, A.V., M.V., W.V., and J.V., were.

79.   Jacob Verret was held in a family room at the Hobbs police station, along with A.V., M.V., W.V., and J.V.

80.   J.V., a one-year-old child at that time, was wearing a sodden diaper in the family room where he was detained with the other Verret children.

81.   Jacob left the room to ask  if someone could help them, where he spoke to a police officer texting on his phone, who gave Jacob scotch tape to remedy J.V.'s diaper situation.

82.   The scotch tape did not work, and J.V. ended up without an effective diaper, soiling himself and the floor of the family room at the Hobbs police station.

83.     Around 5:30 a.m., Mr. Floyd was finally permitted to go into the station to get Mrs. Verret and Ben from their interview rooms.

84.     Around the same time, an unknown woman came into the family room, claiming she was a child counselor, and an officer accompanied Jacob, A.V., M.V., W.V., and J.V. downstairs.

85.     The Verret family was held in custody by the Defendants until this time, over a time span of approximately four and one-half hours, until they were released and allowed to join Mr. Floyd.

86.     Defendant McCall and the chaplain met the Verret family, as they left the police station, in the parking lot.

87.     During the time they held the Verret family, the Defendants did not interview the Verret family about the shooting or any events leading up to or following the shooting.

88.     During the time the Defendants held the Verret family, the New Mexico State Police did not interview the Verret family about the shooting or any events leading up to or following the shooting.

89.     During the time the Hobbs Defendants held the Verret family, nobody questioned anyone in the Verret family or discussed the shooting of Mr. Verret and the events leading up to or following the shooting.

90.     Nobody told the Verret family that Mr. Verret had been shot and killed until Mr. Floyd told the Verret family in the parking lot after the Hobbs Defendants released them.

91.     Nobody told anybody in the Verret family that they were under suspicion for being involved with any criminal wrongdoing.

92.     Nobody talked to anybody in the Verret family regarding anything they may have witnessed in conjunction with the shooting or with the events leading up to or following the shooting while they were in custody.

93.     Nobody told the Verret family why they were being detained.

94.     During the time the Verret family was held and during their release, nobody told the Verret family that there were concerns about the family going to the Verret house after being released, and in fact, Mrs. Verret went to the Verret house with Mr. Floyd that afternoon where she was escorted into the home to retrieve the family dog and retrieve clothing for the family.

### FIRST CAUSE OF ACTION
#### (Violations of the New Mexico Tort Claims Act)
**(Against Defendants Hobbs, Hobbs Police Department, Chief McCall, Hardison, Generotzky, Blevins, Eubank, Munro, Keenan, Evans, Herndon, James, and John Does )**

95.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully stated herein.

96.     Defendants McCall, Hardison, Generotzky, Blevins, Eubank, Munro, Keenan, Evans, Herndon, James, and John Does, as law enforcement officers for purposes of the New Mexico Tort Claims Act, NMSA 1978, § 41-4-12, had the duty in any activity actually undertaken for the safety of others, including Plaintiffs, to exercise that care ordinarily exercised by a reasonable, prudent, and qualified officer in light of what was being done. In addition, they had a duty to properly screen, hire, train, monitor, supervise and discipline subordinate employees, agents, and contractors as part of that responsibility.

97.     Defendants McCall, Hardison, Generotzky, Blevins, Eubank, Munro, Keenan, Evans, Herndon, James, and John Does, seized, falsely arrested, falsely imprisoned, and wrongfully detained Plaintiffs.

98.     The conduct of all of these Defendants caused injury to Plaintiffs resulting from false imprisonment; false arrest; and deprivation of rights, privileges and immunities secured by the Constitutions and laws of the United States and the State of New Mexico.

99.     The conduct of these Defendants was a direct and proximate cause of the injuries and damages to Plaintiffs, set forth below.

100.     Defendants Hobbs and Hobbs Police Department were the governmental entities that had immediate supervisory responsibility over the actions of Hobbs police officers, including but not limited to Defendants McCall, Hardison, Generotzky, Blevins, Eubank, Munro, Keenan, Evans, Herndon, James, and John Does.

101.     Therefore, Defendants Hobbs and Hobbs Police Department are jointly and severally liable for all injuries or damages caused by the negligence of any of their employees and agents under the doctrine of vicarious liability or for intentional and negligent tortious conduct on the part of their employees and agents in accord with the doctrine of aided in agency.

## SECOND CAUSE OF ACTION
### (Civil Rights Violations Under 42 U.S.C. § 1983)
### (Against Defendants Hobbs, Hobbs Police Department, Chief McCall, in his individual and official capacity, Hardison, Generotzky, Blevins, Eubank, Munro, Keenan, Evans, Herndon, James, and John Does in their individual capacities)

102.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully stated herein.

103.     Plaintiffs have a right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the Constitution of the United States.

104.     Plaintiffs were unreasonably seized when they were required to accompany Defendants to the police station and were unreasonably detained when Defendants would not permit Plaintiffs to leave.

105.    The individual Defendants who engaged in the act of seizing and detaining Plaintiffs violated their clearly established constitutional rights to be free from unlawful seizure and wrongful detention, protected by the Fourth Amendment to the United States Constitution. Plaintiffs were seized and detained with no reasonable suspicion, no probable cause, and no lawful justification of any type whatsoever.

106.    Any individual Defendant who was in a position to stop the unlawful seizure and detention of Plaintiffs and did not do so also violated Plaintiffs' rights to be free from false arrest, false imprisonment, and wrongful detention, protected by the Fourth Amendment to the United States Constitution.

107.    The rights in question were clearly established prior to the events complained of herein, and thus Defendants were or should have been aware that their conduct, as described herein, would be in violation of Plaintiffs' rights. Defendants committed affirmative acts, participated in another's affirmative acts, or failed to perform acts which they were required by law to perform.

108.    As a direct and proximate result of the wrongful and unlawful actions of Defendants, Plaintiffs were injured and have suffered and continue to suffer damages, including emotional distress.

109.    Prior to the acts and omissions alleged herein, Defendants Hobbs, Hobbs Police Department, and Chief McCall failed to properly create, adopt, and inculcate appropriate policies and procedures for officers employed by them; failed to properly train, monitor, supervise, and discipline officers employed by them; and failed to otherwise institute adequate procedures and policies that would protect the rights of Plaintiffs. These acts and omissions were direct and proximate causes of the injuries complained of by Plaintiffs.

110.    The acts and omissions of Defendants were undertaken under color of state law and operated to deprive Plaintiffs of their federal rights.

111.    In doing the acts set forth above, Defendants acted oppressively, maliciously, recklessly, and in knowing and conscious disregard of and with callous indifference towards Plaintiffs' rights, justifying an award of punitive damages.

### DAMAGES

112.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully stated herein.

113.    As a direct and proximate result of the wrongful and unlawful actions of Defendants, described above, Plaintiffs were injured and have suffered and continue to suffer damages, including:

      (a)    emotional distress resulting from the incidents described above; and

      (b)    deprivation of constitutional rights.

114.    Because the conduct of Defendants involved intentional misconduct, recklessness, gross negligence, willfulness, or callous indifference to Plaintiffs' rights, or because Defendants' conduct was motivated by malice, evil motive, or intent, Plaintiff is entitled to recover awards of punitive and exemplary damages separately against said Defendants in their individual capacities under Plaintiffs' § 1983 claims in amounts to be determined at the trial of this cause.

WHEREFORE, Plaintiffs respectfully pray for and demand judgment against the Defendants as follows:

      (a)    compensatory damages, including emotional distress, pain and suffering, and other consequential, incidental, and special damages, under any or all of the causes of action, in an amount to be determined at the trial of this case;

(b)     punitive and exemplary damages pursuant to 42 U.S.C. § 1983 in an amount to be determined at the trial of this case;

(c)     pre-judgment and post-judgment interest, all in amounts to be determined according to law;

(d)     recovery of the costs of action herein, including attorneys' fees on Plaintiffs' 42 U.S.C. § 1983 claims, pursuant to 42 U.S.C. § 1988; and

(e)     such further relief as the Court deems just and proper.

## <u>REQUEST FOR JURY TRIAL</u>

COME NOW Plaintiffs, by and through their counsel, and request trial by jury on all issues so triable.

Respectfully submitted,

ROTHSTEIN DONATELLI LLP


*/S/ Carolyn M. "Cammie" Nichols*
Carolyn M. "Cammie" Nichols
500 4th Street, N.W., Suite 400
Albuquerque, NM 87102
(505) 243-1443

and

Caroline "KC" Manierre
1215 Paseo de Peralta
Post Office Box 8180
Santa Fe, NM 87504
(505) 988-8004

*Attorneys for Plaintiffs*

16